UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. S-1 4:15 CR 335 CDP (DDN) |
| | ) | |
| DWANE TAYLOR, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES OF AMERICA'S OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

COMES NOW the United States of America and opposes defendant Dwane Taylor's
(Taylor) motion to suppress evidence (Doc. #88).  The United States of America States as
follows in support of its response:

**INTRODUCTION**

Taylor has taken an "everything but the kitchen sink" approach to his motion to suppress
evidence in moving to challenge 13 separate instances of search and/or seizure by law
enforcement.

| ITEM [1] | OWNER | RESPONSE CATEGORY | BURDEN OF PROOF |
|---|---|---|---|
| DNA (3) | Dwane Taylor | Seized, But Subsequently Destroyed | Taylor |
| Monte Carlo (4) | Dwane Taylor | Nothing Seized | Taylor |
| Storage Trailer (5) | Dwane Taylor | Nothing Seized | Taylor |
| Chevrolet Impala (8) | Dwane Taylor | Nothing Seized | Taylor |
| | | | |

---

[1] The "(#)" corresponds to the numbering system utilized by Taylor in his motion.

1

| ITEM | OWNER | RESPONSE CATEGORY | BURDEN OF PROOF |
|---|---|---|---|
| Mobile phone (1) | Juanita Davis | No Standing | Taylor |
| 314-258-2862 Records (7) | AT&T | No Standing | Taylor |
| Mobile Phones (10) | Joe Edger Kassandra Robinson | No Standing | Taylor |
| Firearm Carrying Case, Magazine and Other Firearm-Related Items (11) | Willie Payne | No Standing | Taylor |
| Mobile Phone (2) | Dwane Taylor | Consent | United States |
| Vehicle Photographs (3) | Dwane Taylor | No Expectation of Privacy | Taylor |
| 1513 Ogden (6) | Dwane Taylor | Valid Search Warrant Supported by Probable Cause | United States |
| Robinson Letter (9) Horton Letter (9) | Dwane Taylor, Kassandra Robinson and Renee Horton | No Expectation of Privacy No Expectation of Privacy | Taylor |

As the "Response Category" above summarizes, the majority of these instances can be quickly disposed of since no items were ever seized -- so there is nothing for this Court to analyze or consider for exclusionary purposes -- or, in other instances, Taylor does not have standing to challenge the search and/or seizure.  There are four items raised by Taylor that require additional analysis.  But, at the end of the day, Taylor's motion can and should be denied in its entirety.

On September 20 and 21, 2016, counsel for the United States and Taylor revisited Taylor's motion and its allegations.  While each item is fully addressed below, the United States

anticipates that Taylor will not to proceed with his challenge to the DNA (item 3) and searches of the Monte Carlo (item 4), Storage Trailer (item 5) and Chevrolet Impala (item 8) because no evidence was seized or no longer exists.  As to the AT&T Mobility records (item 10), the United States anticipates that Taylor will be withdrawing his challenge to those records.

## RELEVANT FACTS

### A.    Overview.

In December 2014, Taylor encountered a female named Juanita Davis (Juanita) who was a drug user and prostitute.  Taylor and Juanita engaged in sex at Taylor's residence.  Taylor went to sleep.  Juanita was gone when Taylor awoke.  So were Taylor's pants and his black and white Chevrolet Impala.  Inside Taylor's missing pants were approximately a half-ounce of heroin; a half-ounce of crack cocaine; and money in the thousands of dollars.  The money taken was owed by Taylor to his drug supplier.  Following the taking of his drugs, money, and vehicle, Taylor received information that another female named Erin Dave (Erin) assisted Juanita after the fact with the use and/or concealment of Taylor's belongings.

### B.    December 16, 2014, Murder of Erin Davis.

On or about December 16, 2014, Taylor and his associate, Joe Edger (Edger), were driving together.  Taylor instructed Edger to drive to the area of Minnesota and Walsh to find Erin.  While inside the vehicle, Edger observed Taylor holding a nine millimeter firearm.  Taylor chambered a round and then concealed the firearm on his person.  Edger and Taylor arrived in the area.  Edger parked in front of an apartment complex.  Erin walked down the street.  Taylor instructed Edger that, when Taylor walked inside with Erin, Edger was to drive around the corner.  Taylor exited the vehicle. Taylor and Erin talked.  Taylor and Erin went inside the building of 300 Walsh.  Edger drove around the corner as instructed.  Shortly after going inside the building, Taylor exited, got inside the vehicle, and told Edger that he shot Erin in the face.  Edger drove Taylor from the area.

The Saint Louis Metropolitan Police Department located Erin inside Apartment C of 300 Walsh on December 16, 2015.  It appeared she had been deceased for possibly a day or more.  The

Evidence Technician Unit of the Saint Louis Metropolitan Police Department recovered one nine millimeter shell casing and one projectile at the scene.   The shell casing was head stamped "FC 9mm LUGER."

**C.      January 16, 2015, Murder of Juanita Davis.**

Following Erin's murder, Taylor and Edger continued to look for Juanita and Taylor's stolen vehicle.   On or about January 16, 2015, Taylor located Juanita in the 4400 block of Pennsylvania and shot her multiple times with the same nine millimeter firearm that was used to kill Erin.  Edger picked Taylor up after the murder and drove him from the area.  Taylor admitted to Edger that Taylor shot and killed Juanita.

The Saint Louis Metropolitan Police Department located Juanita deceased in the street in front of 4420 Pennsylvania. The Evidence Technician Unit of the Saint Louis Metropolitan Police Department recovered one bullet and seven nine millimeter caliber shell casings.  Five of the shell casings were head stamped "R-P 9mm LUGER."  Two of the shell casings were head stamped "FC 9mm LUGER."

Sometime after Juanita's murder, Taylor located his stolen vehicle.  Among other things, some of the money and controlled substances taken by Juanita were missing.

**D.      Sunset Hills Police Department and Major Case Squad Investigation Into the June 3, 2015, Murder of Terry Tobey.**

On June 3, 2015, Terry Tobey was found dead inside her Sunset Hills, Missouri, residence.  Tobey had been shot.  Sunset Hills Police Department, in conjunction with the Major Case Squad, initiated an investigation into Tobey's homicide.   Investigators came into contact with Taylor during the course of that on-going investigation.

4

### 1.      Taylor's Consent to Search his Mobile Phone.

On or about June 8 and 9, 2015, investigators made contact with Tobey's daughter-in-law, Leigh Ann Lamear, at Lemear's residence.  Taylor was present at the residence on both occasions when investigators arrived.   Taylor identified himself as a "friend."   On both occasions, investigators spoke with Taylor at the residence.  Taylor was cordial and cooperative.

During the June 9 conversation, Taylor was asked if he would consent to a forensic examination of his mobile phone.  Taylor said "no," and that the police would have to "work for that."  Taylor did agree to allow one of the detectives to look through his phone so long as he did not have to give the police possession of the phone.[2]  The detective agreed, and Taylor provided the detective access to his mobile phone while the two of them were present at Lemear's 4434 Minnesota Street residence.  The detective looked through the phone and returned it to Taylor immediately after.  The detective also provided Taylor with his contact information.

On June 10, 2015, Taylor contacted the detective again.  Taylor incorrectly believed investigators were attempting to locate him.  (Investigators were actually attempting to locate Taylor's ex-girlfriend with whom Taylor said he was with at the time the Tobey murder was occurring.)  Taylor was again asked by the detective if Taylor would allow investigators to conduct a forensic analysis of his phone.  Taylor agreed to the examination and meet the detective at the Regional Computer Crimes Enforcement and Education Group (RCCEEG) in Clayton, Missouri.

Taylor arrived at RCCEEG the same day and voluntarily provided his mobile phone to the detective.   Taylor waited in the RCCEEG lobby for approximately three hours while the examination was underway.  Once the detective realized that the examination would last several more hours, Taylor was advised of the delay.  Taylor agreed to leave his phone for continued examination on two conditions: (a) Taylor would have his phone returned to him as soon as the

---

[2] Taylor was also asked by the police if they could search his vehicle.  (The same vehicle previously stolen by Juanita, along with Taylor's drugs and money.)   Taylor provided verbal consent allowing the police to do so.  Nothing of evidentiary value was located or seized from the vehicle.

data capture was complete; and (b) Taylor was provided possession of his phone's "SIM card" so he could access his contacts and reactivate phone service on a different mobile device.  The detective agreed.  The detective asked Taylor to execute a written "Permission to Search" form confirming that Taylor was agreeing to leave his mobile device with RCCEEG.  Taylor refused. Taylor stated that his verbal agreement was enough and that he did not feel comfortable signing any paperwork.  Although Taylor refused to sign any paperwork, the detective recorded his exchange with Taylor.  For example, Taylor stated:

| | |
|---|---|
| Taylor: | I can just leave the phone. |
| Detective: | You know, you still won't sign it [consent form] for me? |
| Taylor: | No. |
| Detective: | You won't sign the consent form? |
| Taylor: | No...I told you man, I know my legal rights bro, I ain't got to give up my phone. |
| Detective: | I know you don't have to. |
| Taylor: | I know that, that's why I'm sayin' I ain't signin' nothin' though. |
| Detective: | Okay, but, but you're still gonna leave the phone with us so we can... |
| Taylor: | Yeah. |

(A true and accurate copy of the recorded conversation is attached hereto as <u>Exhibit 1</u>.)[3]  Taylor was provided his SIM card and left.

The processing of Taylor's phone continued overnight.  A court order was also obtained for phone records relative to Taylor's phone.  The next morning, on June 11, 2015, the detective obtained Taylor's phone and attempted to return it to Taylor.  The detective was unable to do so. So, Taylor's phone was provided to the Sunset Hills Police Department – the lead investigating agency and agency responsible for maintain the evidence associated with the case – for return to

---

[3] Due to volume, the exhibits referenced by the United States in its filing will be provided separately to the Court and opposing counsel in electronic format.

Taylor.

## 2. Taylor's Valid Waiver of His *Miranda* Rights.

On June 17, 2015, Taylor responded to the Sunset Hills Police Department for the purpose of receiving his mobile phone. Taylor traveled to the police department in his Chevrolet Impala vehicle. (The same vehicle that had been previously stolen by Juanita, along with Taylor's drugs and money.) Taylor parked the vehicle in the police department parking lot.

Upon arrival, Sunset Hills Detective Peisker asked Taylor if the two of them could speak about the on-going investigation. Taylor agreed. Detective Peisker and Detective Sergeant Raney escorted Taylor to an interview room. The room was equipped with video and audio recording equipment that was utilized. Taylor was advised of his constitutional *Miranda* rights. He was also provided with a written form containing a statement of those rights. Taylor indicated that he understood his rights. Taylor also indicated that he was unwilling to execute the written form. Although unwilling to execute the form, Taylor indicated that he understood his rights and was willing to speak with the detectives. (A true and accurate copy of the "Advice of Rights" form reviewed with Taylor is attached hereto as Exhibit 2.) Taylor then spoke with detectives for approximately one and a half hours. (A true and accurate copy of the recorded interview is attached as Exhibit 3.)

After the interview was concluded, Taylor's mobile phone was returned. Taylor executed a property receipt for it. (A true and accurate copy of the property receipt is attached hereto as Exhibit 4.) Taylor was asked if he would consent to a buccal swab of his mouth for DNA collection purposes. Taylor agreed and executed a written "Consent for DNA Collection Form." (A true and accurate copy of the form is attached as Exhibit 5.) Taylor's DNA was collected. (The DNA has since been destroyed as part of standard operating procedure.)

At some point after Taylor's arrival, a member of the Sunset Hills Police Department took photographs of Taylor's Impala parked on the public lot. (True and accurate copies of the photographs are collectively attached hereto as Exhibit 6.)

No further contact or communication between Taylor and the Sunset Hills Police Department or Major Case Squad occurred after June 17, 2015.

**E.      July 16, 2015, Indictment.**

On July 16, 2015, Taylor was indicted by a federal grand jury for his role in, among other things, the murders of Erin and Juanita and Taylor's drug trafficking that was responsible for each's death (Doc. #2).  Taylor was specifically charged as follows:

<table>
<tr><td>Count 1:</td><td>conspiracy to possess with the intent to distribute heroin and cocaine base (crack) in violation of Title 21, United States Code, Sections 846 and 841;</td></tr>
<tr><td>Count 2:</td><td>discharge of a firearm in furtherance of drug trafficking where death results in violation of Title 18, United States Code, Section 924(j); and</td></tr>
<tr><td>Count 3:</td><td>discharge of a firearm in furtherance of drug trafficking where death results in violation of Title 18, United States Code, Section 924(j).</td></tr>
</table>

Taylor was ordered detained pending trial (Doc. #18).

**F.      August 2015, Obstruction of Justice and Witness Tampering.**

**1.      Kassandra Robinson.**

Following his federal indictment, Taylor was detained at the Sainte Genevieve County detention facility.  On August 15, 2015, a female named Kassandra Robinson (Robinson) had an in-person meeting with Taylor at the detention facility.  Among other things, Taylor informed Robinson that he would be sending to Robinson a letter about "old girl."   Robinson understood "old girl" to be a coded reference to Edger.

Sometime after the in-person meeting, Robinson received a letter from Taylor.  Robinson opened and read it.  Among other things, the letter directed Robinson to contact Edger.  The purpose of the letter was for Robinson to get Edger to lie and indicate that what Edger had previously told law enforcement about the murders was fabricated and coerced.  Taylor's letter included Edger's phone number for Robinson to contact and a script for Robinson to read while speaking with Edger.  Taylor also directed Robinson to tear up the letter after contacting Edger.

(A true and accurate copy of the "Robinson Letter" is attached hereto as Exhibit 7.)[4]   However, Robinson did not contact Edger because she learned from her own independent research that Edger had been arrested and detained on or about August 17, 2015.  Robinson did destroy the letter.

### 2.      Renee Horton.

Long-time friend Renee Horton was aware that Taylor was indicted federally in July 2015 for his alleged involvement in two drug-related murders.  Horton placed money on Taylor's account at the detention facility.  In late-August 2015, Horton received a letter from Taylor.  The letter was sent via United States mail.  The letter was delivered to Horton at her home address.  Horton read the letter.  Horton kept the letter.  Among other things, the letter stated:

> "Now on some important stuff.  Since my mind has been clear and I am starting to remember more.  On one my situations.  I was out west and I slept at your house.  January 16 to 17 to AM-PM.  I wouldn't really need you, but it's true.  You probably will remember a date I slept in the front room on the floor -- and I left before you got up.  And you said something to me about it.  But my evidence on that day will be the west side phone towers.

> "In my situations no one is saying they saw me.  It's one dude trying to get out of their stuff and using their assumption of me to save them" (emphasis in original).  (A true and accurate copy of the "Horton Letter" is attached hereto as Exhibit 8.)

Horton understood that Juanita was murdered after 10:00 p.m. on January 16, 2015.  After reviewing certain documents, Horton determined that Taylor never slept at her house between January 16 and 17, 2015, and that Taylor's statements in his letter were false.  Horton also provided law enforcement officials with the original Horton Letter that Horton had kept.

---

[4]  Officers with the detention facility reviewed Taylor's out-going mail and intercepted the letter Robinson and Horton Letters.  The Robinson Letter was photographed and a report made as to its contents.  (A true and accurate copy of the Sainte Genevieve County Sheriff's Office Report is attached hereto as Exhibit 9.)  The Horton Letter was copied.  The Robinson and Horton Letters were then allowed to be delivered via United States mail.

**G.      October 7, 2015, Superseding Indictment.**

On October 7, 2015, Taylor and Edger were charged in a superseding indictment.  Both were specifically charged as follows:

Count 1:    conspiracy to possess with the intent to distribute heroin and cocaine base (crack) in violation of Title 21, United States Code, Sections 846 and 841 (Taylor);

Count 2:    conspiracy to possess a firearm in furtherance of drug trafficking in violation of Title 18, United States Code, Section 924(o) (Taylor and Edger);

Count 3:    discharge of a firearm in furtherance of drug trafficking where death results in violation of Title 18, United States Code, Section 924(j) (Taylor and Edger); and

Count 4:    discharge of a firearm in furtherance of drug trafficking where death results in violation of Title 18, United States Code, Section 924(j) (Taylor and Edger).

Counts 5 and 7:    witness tampering in violation of Title 18, United States Code, Section 1512 (b)(1) (Taylor); and

Count 6:    document tampering and destruction in violation of Title 18, United States Code, Section 1512(c)(1) (Taylor).

Taylor has filed multiple pretrial motions in connection with this superseding indictment (Docs. # 88-91).  In stark contrast, Edger entered his guilty plea on August 16, 2016 (Doc. #103).

10

**RESPONSE**

A.    **CLAIMS REGARDING THE DNA, MONTE CARLO, STORAGE TRAILER AND IMPALA (ITEMS 3, 4, 5 AND 8) SHOULD BE DENIED AS MOOT BECAUSE   NO EVIDENCE WAS SEIZED DURING THE SEARCH OF CERTAIN LOCATIONS OR, IF IT WERE, IT HAS BEEN DESTROYED.**

      1.    **Summary Background.**

          a.    <u>DNA Retrieval by Consent</u>.

In connection with the Tobey homicide investigation, detectives with the Sunset Hills Police Department requested Taylor to consent to the collection of his DNA on June 17, 2015. Taylor agreed and executed a written "Consent for DNA Collection" form (Exh. 5).  Taylor's DNA was collected.  At the conclusion of the Sunset Hills Police Department's investigation, Taylor's DNA was destroyed.

          b.    <u>Monte Carlo Search Pursuant to Federal Warrant</u>.

In connection with the Davises homicide investigation, on July 24, 2015, United States Court Magistrate Judge Thomas C. Mummert issued a search and seizure warrant ordering members of law enforcement to search a Monte Carlo bearing Illinois license plate E87-8920.  (A true and accurate copy of the federal "Monte Carlo Warrant" is attached hereto as <u>Exhibit 10</u>.  For brevity purposes, the Monte Carlo Warrant application has been omitted as it is the same as the application contained in Exhibit 15 (the Ogden Warrant).)  The warrant was executed the same day.  A search of the vehicle was conducted pursuant to the federal search warrant.  Nothing of evidentiary value was located or seized.

11

c.       Storage Trailer Search Pursuant to Federal Warrant.

In connection with the Davises homicide investigation, on July 24, 2015, on July 24, 2015, United States Court Magistrate Judge Thomas C. Mummert issued a search and seizure warrant ordering members of law enforcement to search a Bracket Master make, "The Ultimate" model storage trailer.  (A true and accurate copy of the federal "Trailer Warrant" is attached hereto as Exhibit 11.  For brevity purposes, the Monte Carlo Warrant application has been omitted as it is the same as the application contained in Exhibit 15 (the Ogden Warrant).)  The warrant was executed the same day.  A search of the trailer was conducted pursuant to the federal search warrant.  Nothing of evidentiary value was located or seized.

d.       Impala Search Pursuant to Federal Warrant.

In connection with the Davises homicide investigation, on July 28, 2015, United States Court Magistrate Judge Shirley Padmore Mensah issued a search and seizure warrant ordering members of law enforcement to search a Chevrolet Impala bearing Missouri temporary license plate 00XAML.  (A true and accurate copy of the federal "Impala Warrant" is attached hereto as Exhibit 12.)  The warrant was executed August 6, 2015.  A search of the vehicle was conducted pursuant to the federal search warrant.  Nothing of evidentiary value was located.  (Some vehicle paperwork was seized, but the United States does not intend to utilized the paperwork in any affirmative way.)

**2.       Discussion.**

The search of the Monte Carlo, storage trailer and Impala challenged by Taylor failed to locate any items of evidentiary value.  Stated another way, there is no evidence the United States will use in its prosecution.  Therefore, Taylor has nothing to "suppress" and this Court would have nothing to exclude if the Fourth Amendment were violated (it wasn't).

Likewise, even though Taylor voluntarily consented -- in writing -- in providing his DNA to law enforcement officials, that DNA has since been destroyed pursuant to the obtaining entity's

standard operating procedures.  Again, Taylor has nothing to "suppress" and this Court would have nothing to exclude if the Fourth Amendment were violated.

Accordingly, Taylor's motion to suppress items associated with the DNA (item 3), the Monte Carlo (item 4), the storage trailer (item 5), and the Impala (item 6) should be denied as moot.

**B.    TAYLOR LACKS STANDING TO ASSERT A PRIVACY INTEREST IN DAVIS' MOBILE PHONE, AT&T RECORDS, EDGER'S AND ROBINSON'S MOBILE PHONES AND PAYNE'S FIREARM-RELATED OBJECTS (ITEMS 1, 7, 10 AND 11).**

**1.    Summary Background.**

a.    <u>Search of Juanita Davis' Phone</u>.

On January 16, 2015, at approximately 10:20 p.m., police officers located Juanita's body in the 4400 block of Pennsylvania Avenue.  She was dead having been shot multiple times.  A mobile phone was located in the street near what was believed to be Juanita's purse.  (It was a Motorola XT1080 model phone.)  The mobile phone, along with other pieces of evidence, was seized as evidence.  On March 12, 2015, a forensic examination of the phone was conducted by the Saint Louis Metropolitan Police Department and a report of the examination was generated.

b.    <u>Search of AT&T Records Pursuant to Federal Warrant</u>.

In connection with the Davises homicide investigation, on July 24, 2015, United States Court Magistrate Judge Thomas C. Mummert issued a search and seizure warrant ordering members of law enforcement to search information possessed by AT&T associated with telephone account 314.258.2826.  (A true and accurate copy of the federal "AT&T Warrant" is attached hereto as <u>Exhibit 13</u>.)  The warrant was executed on or about July 27, 2015.  On August 27, 2015, AT&T Mobility provided information responsive to the federal warrant.

13

      c.      <u>Consent Search of Edger's and/or Robinson's Phone</u>.

Edger -- and Edger only -- possessed and utilized a Samsung Galaxy, model SHG-1747, mobile phone.  On September 3, 2015, Edger provided law enforcement with his consent authorizing officials to search his mobile phone.

Robinson — and Robinson only — possessed and utilized a HTC, model 0PCV200 mobile phone.  On September 23, 2015, Robinson provided law enforcement with her consent authorizing officials to search his mobile phone.

      d.      <u>Consent Retrieval of Firearm-Related Items</u>.

In connection with the Davises homicide investigation, investigators made contact with Willie Payne in October 2015.  Among other things, Mr. Payne was the victim of a November 13, 2014, residential burglary during which a Bersa make, model BP9MCC, nine millimeter caliber firearm was taken.  Mr. Payne was the purchaser and registered owner of that firearm up until it was stolen.  While meeting with investigators, Mr. Payne voluntarily provided to officials the firearm's carrying case, spare magazine and paperwork that accompanied Mr. Payne's purchase of the firearm.

## 2.   Discussion.

The Fourth Amendment protects against unreasonable searches and seizures by the government.  U.S. Const. amend. IV.  Standing to complain about the seizure of evidence under the Fourth Amendment requires that the person establish that she has a legitimate expectation of privacy in the place searched.  *Rakas v. Illinois*, 439 U.S. 128, 134 (1978); *United States v. Stallings*, 28 F.3d 58, 60 (8th Cir. 1994).  Fourth Amendment rights are personal and cannot be asserted vicariously.  *See United States v. Pierson,* 219 F.3d 803, 806 (8th Cir. 2000); *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994); *see also United States v. House*, No. 1:13CR00072 SNLJ, 2014 WL 982767, at *9 (E.D. Mo. Mar. 12, 2014), *aff'd*, 825 F.3d 381 (8th Cir. 2016) ("Fourth Amendment rights are personal rights and like some other constitutional

rights, may not be vicariously asserted by someone else."); *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961 (1969) (same).

A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched . . . has no standing to claim that they were searched or seized illegally." *Id.* A defendant moving to suppress evidence has the burden of showing a legitimate expectation of privacy in the area searched. *See Id.*; *United States v. Wiest,* 596 F.3d 906, 910 (8th Cir. 2010); *see also United States v. Verduzco-Morett*, No. 4:11-CR-00263-1-BCW, 2013 WL 3832429, at *6 (W.D. Mo. July 23, 2013) (citing *United States v. Barragan,* 379 F.3d 524, 529 (8th Cir. 2004)). Factors relevant to the determination of standing include:

> "ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case." *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000) (citation omitted).

Suppression of the product of a Fourth Amendment violation cannot be successfully urged by those who are aggrieved solely by the introduction of damaging evidence. *House*, 2014 WL 982767 at *9–10 (citation omitted).

Courts have concluded that an individual does not have a legitimate expectation of privacy in items that are not in the individual's name. *United States v. Lozano,* 623 F.3d 1055, 1062–63 (9th Cir. 2010) (O'Scannlain, J., specially concurring) (citing *United States v. Smith,* 39 F.3d 1143, 1145 (11th Cir. 1994); *United States v. Daniel,* 982 F.2d 146, 149 (5th Cir. 1993); *United States v. Koenig,* 856 F.2d 843, 846 (7th Cir. 1988); *United States v. Givens,* 733 F.2d 339, 341–42 (4th Cir. 1984)); *see also United States v. Perez,* 64 Fed. App'x 635, 636 (9th Cir.2003) (unpublished).  In this case, Taylor cannot show any harm to his constitutional rights flowing from the United States' obtaining information from victim Juanita Davis' phone, records produced by AT&T pursuant to a valid search warrant, Edger's or Robinson's mobile phone, and firearm-related objects and documentation voluntarily provided by Mr. Payne.

a.      Search of Juanita Davis' Phone, Edger's and/or Robinson's Phones, and Payne's Firearm-Related Items.

Taylor has zero connection to Juanita Davis' mobile phone, Edger's and/or Robinson's mobile phones and the items voluntarily produced by Mr. Payne.  Taylor never had ownership, possession or control of any of these items.  He never used them.  Taylor was never able to regulate access to them.  Taylor never exhibited any objective or subjective expectation of privacy in the items or areas searched.  Simply stated, Taylor had no legitimate expectation of privacy -- period.  Therefore, he has no standing to claim that they were searched or seized illegally.

b.      Search of AT&T Records Pursuant to Federal Warrant.

Taylor does not have a legitimate expectation of privacy in the historical call log and cell-site records obtained from AT&T either.  As previously noted, Taylor bears the burden of proving that he has a legitimate expectation of privacy in an object such that he can claim the protection of the Fourth Amendment in challenging the United States' search of that object. *United States v. Dore*, 586 F. App'x 42, 46 (2d Cir.), *cert. denied,* 135 S. Ct. 505, 190 L. Ed. 2d 380 (2014) (citing *Rawlings v. Kentucky,* 448 U.S. 98, 104–05, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Watson,* 404 F.3d 163, 166 (2nd Cir.2005)).

Taylor lacks a reasonable expectation of privacy in the records obtained in this case.  It is well established that a reasonable expectation of privacy extends only to the content of telephone conversations, not to records that indicate that the conversations occurred.  *United States v. Lustig,* 555 F.2d 737, 747 n.10 (9th Cir. 1977); *see also United States v. Clenney,* 631 F.3d 658, 666 (4th Cir. 2011) (holding that telephone customers have no constitutionally cognizable privacy interests in basic subscriber information); *United States v. Davis*, No. CRIM. 10-339-HA, 2011 WL 2036463, at *3–4 (D. Or. May 24, 2011).  Basic subscriber data which identifies a call's origination, destination, duration, and time of call enjoy no privacy protection

16

because the data is incidental to the use of the telephone, and contains no content information. *See United States v. Reed,* 575 F.3d 900, 914-16 (9th Cir. 2009).

Telephone users realize that telephone companies retain records of this information for a variety of legitimate business purposes, including billing and fraud protection. *Smith v. Maryland,* 442 U.S. 735, 41–43 (1979). Telephone companies also maintain records of the identity and location of the cellular antenna towers that received signals from a specific cell phone to determine whether roaming charges should apply and to track call volume by location. *In re U.S. for an Order Authorizing the Use of Two Pen Register & Trap & Trace Devices,* 632 F.Supp.2d 202, 205 (E.D.N.Y. 2008); *In re Applications of U.S. for Orders Pursuant to 18 U.S.C. § 2703(d),* 509 F.Supp.2d 76, 78 (D. Mass. 2007).

When an individual uses a telephone, he or she must expose certain information, including the number dialed, to the telephone company's switching equipment to enable the company to transfer the call. *Smith,* 442 U.S. at 744 (citation omitted). Such information is not considered reasonably private because it must be transmitted to the service provider for specific routing purposes. *United States v. Forrester,* 512 F.3d 500, 510 (9th Cir. 2008) (citation omitted). In this case, the information at issue refers to the identity of the switching equipment used in directing Taylor's calls, which may or may not have been exposed knowingly to the

telephone company for routing purposes.[5]

The network information at issue in this case falls within the scope of basic subscriber information.  The records in this case do not list private location data.  The network element merely identifies the switching equipment, which the Supreme Court likened to an operator, that routed telephone calls. *See Smith,* 442 U.S. at 744.  These records do not constitute continuous surreptitious monitoring of Taylor.  They indicate when someone made or received a call on this cell phone, and which switching equipment transacted the call.  The records provide no detailed location data or cell-site information that was unknowingly and automatically transmitted to AT&T absent any action by the telephone user.  As a result, these records are admissible as business records. *See United States v. Ahumada–Avalos,* 875 F.2d 681, 683 (9th Cir.1989) (citing *Smith,* 442 U.S. at 737–45); *Davis*, No. CRIM. 10-339-HA, 2011 WL 2036463, at *4.

As the Court noted in *United States v. Thousand*, 558 F. App'x 666, 669–70 (7th Cir. 2014):

> "We have not found any federal appellate decision accepting
> Thousand's premise that obtaining cell-site data from

---

[5] The records provided by AT&T Mobility show that Taylor was not the registered subscriber for that phone.  (A true and accurate copy of the subscriber information is attached hereto as Exhibit 14.)  Society does not recognize as reasonable someone's claimed privacy interest in a fictitious name. *See United States v. Lewis*, 738 F.2d 916, 919–20 n.2 (8th Cir. 1984); *United States v. DiMaggio*, 744 F.Supp. 43, 46 (N.D.N.Y.1990) (holding that when an individual withholds his true identity "he has effectively repudiated any connection or interest in the item vis-a-vis society").  Following this reasoning, several district courts have held that a defendant lacks standing to challenge cell phone records in which the defendant was not a registered subscriber. *See*, e.g., *United States v. Davis*, No. CRIM. 10-339-HA, 2011 WL 2036463, at *2-3 (D. Or. May 24, 2011); *United States v. Novas*, 640 F.Supp.2d 256, 264 (S.D.N.Y. 2009), reversed on other grounds by *United States v. Novas*, 597 F.3d 492 (2d Cir. 2010); *United States v. Suarez–Blanca*, No. 1:07–CR–0023–MHS/AJB, 2008 WL 4200156, at *6–7 (N.D.Ga. Apr. 21, 2008) ("The subscriber name indicates that [the defendant] either was trying to distance himself from the cell phone or had no interest in the cell phone.  As such, the use of a fictitious name or names of third party indicates that [the defendant] does not have a privacy interest in the phones."); *United States v. Skinner*, No. 3:06–CR–100, 2007 WL 1556596, at *15–17 (E.D.Tenn. May 24, 2007) (finding no reasonable expectation of privacy in cell phone records where the defendant was not the legitimate subscriber to the phone); *United States v. Solomon*, No. 02: 05cr385, 2007 WL 927960, at *3 (W.D.Pa. March 26, 2007).

> telecommunications companies—under any factual scenario—
> raises a concern under the Fourth Amendment."

*See also*, e.g., *United States v. Baker*, No. 1:11CR 103 JAR, 2012 WL 12527307, at *9 (E.D. Mo. Sept. 29, 2012), *report and recommendation adopted sub nom. United States v. Turner*, No. 1:11CR103 JAR, 2013 WL 11271638 (E.D. Mo. Mar. 15, 2013), *aff'd,* 781 F.3d 374 (8th Cir. 2015) (denial of motion to suppress precision location information obtained from phones the defendant did not own, use, or purchase); *United States v. Davis*, No. CRIM. 10-339-HA, 2011 WL 2036463, at *2 (D. Or. May 24, 2011) (defendant unable to demonstrate standing to contest government's acquisition of cell phone records); *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 459 (D.C.Cir. 2000) (finding no legitimate expectation of privacy in information, including cell site location information, conveyed to the telephone company in order to complete calls).

*        *        *

Taylor cannot establish a legitimate, reasonable expectation of privacy in victim Juanita Davis' mobile phone (item 1), the AT&T business records (item 7), Edger's and Robinson's mobile phones (item 10), and the items possessed and voluntary provided by Mr. Payne (item 11).  Therefore, Taylor lacks standing and his motion to suppress in this regard should be denied.

**C.    TAYLOR PROVIDED VOLUNTARY CONSENT FOR THE SEARCH OF HIS MOBILE PHONE (ITEM 2).**

**1.    Summary Background.**

As discussed in Section D1 as part of the Tobey homicide investigation, Taylor provided voluntary consent for the search of his mobile phone.  Specifically, on June 9, Taylor provided the detective limited access to his mobile phone.  On June 10, 2015, Taylor provided the detective more unfettered access to his mobile phone and hand delivered it to the detective at the RCCEEG. After waiting hours for the phone's analysis, Taylor agreed to physically leave his phone overnight with the RCCEEG so long as he was provided his SIM card and the phone returned when the

analysis was completed.  Although Taylor refused to sign any written document, Taylor's verbal consent was recorded by the detective (Exh. 1).

### 2.   Discussion.

The retrieval of electronic data from mobile phones is subject to the warrant requirement of the Fourth Amendment.  Mobile phones have the capacity to store immense amounts of electronic data, including phone numbers, music, photographs, and videos.  *See United States v. James*, No. 1:06CR 134 CDP (E.D. Mo. Mar. 4, 2008) (citing *United States v. Black*, No. 04-CR-162-S, 2004 WL 3091175, at *7 (W.D. Wis. Jan. 7, 2004)).  They store private information that extends well beyond the telephone numbers of calls received.  *See Id.* (citing *United States v. Park*, No. CR 05-375 SL, 2007 WL 1521573, at *8 (N.D. Cal. May 23, 2007) ("[T]he line between cell phones and personal computers has grown increasingly blurry . . . .").  A defendant has a reasonable expectation of privacy in the information stored in his own mobile phone.  *See James*, No. 1:06CR 134 CDP (citing *United States v. Finley*, 477 F.3d 250, 259 (5th Cir.), cert. denied, 127 S. Ct. 2065 (2007) (citations omitted)).

However, an established exception to the warrant requirement of the Fourth Amendment is the voluntary consent to the search by the subject.  *Illinois v. Rodriguez*, 497 U.S. 177, 179, 189 (1990).  "Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area."  *United States v. Chaidez,* 906 F.2d 377, 380 (8th Cir. 1990).  Whether consent was voluntarily given depends upon the totality of the circumstances.  *United States v. Heath*, 58 F.3d 1271, 1276 (8th Cir. 1995).  Consent is voluntary if it is the product of an "essentially free and unconstrained choice by its maker."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000).

A court determines the voluntariness of a person's consent by assessing "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."  *Bustamonte,* 412 U.S. at 226; *see also United States v. Cisneros–Gutierrez,* 598

20

F.3d 997, 1003 (8th Cir. 2010) ("In determining voluntariness, the personal characteristics of the individual who supposedly consented and the environment in which the consent allegedly occurred are relevant."); *United States v. Smith,* 260 F.3d 922, 924 (8th Cir. 2001) (discussing the individual characteristics and environmental factors relevant to a court's determination of the voluntariness of a person's consent); *Chaidez,* 906 F.2d at 381 (same). "The government bears the burden to prove by a preponderance of the evidence that consent to search was freely given...." *Smith,* 260 F.3d at 924; *United States v. Cedano–Medina,* 366 F.3d 682, 684 (8th Cir. 2004).

Specifically, Courts look to the following, non-exhaustive list of relevant factors:

(1)     the individual's age and mental ability;

(2)     whether the individual was intoxicated or under the influence of drugs;

(3)     whether the individual was informed of [his] *Miranda* rights; and

(4)     whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. *United States v. Quintero,* 648 F.3d 660, 667 (8th Cir.2011) (quoting *United States v. Golinveaux,* 611 F.3d 956, 959 (8th Cir. 2010)); *United States v. Thorne,* No. 13-CR-3052-LRR, 2014 WL 1165866, at *2 (N.D. Iowa Mar. 21, 2014).

It is also important to consider the environment in which an individual's consent is obtained, including:

(1)     the length of the detention;

(2)      whether the police used threats, physical intimidation, or punishment to extract consent;

(3)     whether the police made promises or misrepresentations;

(4)     whether the individual was in custody or under arrest when consent was given;

(5)      whether the consent was given in public or in a secluded location; and

(6) whether the individual stood by silently or objected to the search. *Id.*

A search conducted pursuant to valid consent does not violate the Fourth Amendment. *United States v. Goodrich,* ––– F.3d ––––, 2014 WL 67753 *3 (8th Cir. 2014).

The totality of the circumstances and the relevant factors establish that Taylor voluntarily consented to the search of the electronic data in his mobile phone.

        a.        <u>Taylor's Age and Mental Ability</u>.

Taylor was able to understand the nature and significance of his actions when consent was given.  There is no evidence to the contrary.  At the time consent was provided, Taylor was an adult male approximately 40 years of age.  There was nothing in his appearance, demeanor, or responses that suggested he was suffering from a mental disorder.  Law enforcement officials had interacted with him on prior occasions and, in each instance, Taylor was intelligent, cordial and articulate.  The same was true at the time Taylor provided consent for the RCCEEG to analyze his mobile phone.

        b.        <u>No Evidence of Intoxication or Drug Influence</u>.

At the time consent was provided, there was nothing in Taylor's appearance, demeanor, or responses that suggested he was under the influence of alcohol or any other controlled substance.

        c.        <u>Taylor Was Not Arrested and No *Miranda* Rights Were Required</u>.

No *Miranda* warnings were given to Taylor because Taylor was not in custody and was not subjected to any interrogation.  He was never place under arrest for anything. However, when it was requested that Taylor leave his phone overnight, the detective attempted to provide Taylor with a written consent form.  Taylor refused to execute the form.  Instead, Taylor confirmed that he had provided the detective with verbal consent and that his verbal consent would be sufficient.  *Saenz,* 474 F.3d at 1137 ("We have not required an officer to

provide *Miranda* warnings before requesting consent to search or held that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary.").

          d.    <u>Taylor's Experience with the Protections of the Legal System</u>.

Taylor was and is an experienced criminal.  In June 2015, Taylor was on parole for a state-level murder conviction that was imposed in approximately 1994.  Taylor was required to report and was reporting to a Missouri Probation and Parole officer on a regular basis.  In February 2015, Taylor had been arrested by the Saint Louis Metropolitan Police Department in connection with the murders of Erin and Juanita.  At the time of questioning, Taylor refused.  Likewise, in June 2015 — in connection with the Tobey murder investigation, Taylor discussed his rights with law enforcement officials on multiple occasions   For example, when originally asked about a forensic examination of his phone on June 9, Taylor was willing to allow a detective to view his mobile phone but not remove the phone from Taylor's possession.  Then, on June 10, 2015, when Taylor was presented with the actual consent form, Taylor specifically stated that he knew his "rights" and that Taylor's verbal consent was sufficient; no written consent was necessary.  Simply stated, Taylor was familiar with the protections afforded him by the legal system and willing to invoke them when he deemed appropriate.

          e.    <u>Lack of Detention</u>.

Taylor was not detained at the time he provided his consent.  First, Taylor agreed to actually bring his mobile phone to the RCCEEG in Clayton, Missouri and provided it directly to the detective.  Taylor waited for approximately three hours as the processing was occurring.  Once it was clear that the processing and analysis was going to take substantially more time, Taylor decided to leave — which he was always free to do.  And, in leaving, Taylor provided renewed consent for the RCCEEG to possess his mobile phone overnight to complete the forensic analysis.

          f.    <u>Lack of Threats, Physical Intimidation or Punishment</u>.

There is no evidence that any law enforcement official threatened, intimidated or

punished Taylor in order to obtain his consent.  In fact, the recorded conversation between Taylor and the detective confirms that Taylor's interactions were friendly, cordial and respectful.

> g.      No Promises or Misrepresentations.

There is no evidence that any law enforcement official promised Taylor anything or made a misrepresentation in order to obtain Taylor's consent.  Taylor requested that, if he were going to leave his phone for overnight analysis — which he did — Taylor be provided the phone's SIM card and that the phone be promptly returned.  The detective agreed.  Taylor received his SIM card, made arrangements with the detective as to how the two of them would communicate in order to arrange the return of Taylor's phone, and Taylor left.

Taylor was not told verbally that he had a right to refuse consent, but, such a verbal warning was not required. *United States v. Zamora–Coronel,* 231 F.3d 466, 470 (8th Cir. 2000) ("Whether an officer [informs a suspect of his right to refuse consent] constitutes 'a significant, but not determinative, factor' in determining voluntariness.") (quoting *Chaidez,* 906 F.2d at 381–82)).

> h.      Taylor's Consent was Provided in a Non-Secluded Location.

Taylor's consent to the RCCEEG analysis was originally provided over the phone, miles away from RCCEEG and the detective who was requesting it.  Taylor then voluntarily travelled to RCCEEG where he voluntarily handed the phone over to the detective.  When Taylor decided that he would no longer stay as the examination was occurring, the discussion of Taylor's consent to the overnight examination occurred in the RCCEEG lobby and continued as the detective escorted Taylor out of the building — not in some secluded or isolated location dominated by law enforcement.

> i.      Taylor was an Active Participant in the Consent Discussion.

As the recording makes clear, and consistent with his original telephone conversation with the detective, Taylor was an active participant in the consent discussion.  Taylor discussed his rights, made demands of the detective, and indicated that, while he was willing to provide his

24

verbal consent, he was unwilling to provide that consent in writing.  There is no evidence that Taylor's will was "overborne."  *United States v. Jorgensen,* 871 F.2d 725, 729 (8th Cir.1989).

*     *     *

Taylor agreed to the search and did so of his own free will.   There is no evidence of coercion or duress whatsoever. When this Court views the totality of the circumstances, it is clear the consent was freely given and not a product of unlawful duress or coercion.   There is no basis for suppression.

**D.   TAYLOR HAD NO EXPECTATION OF PRIVACY IN THE EXTERIOR OF HIS VEHICLE (ITEM 3) WHILE IT WAS PARKED ON A PUBLIC LOT.**

**1.     Summary Background.**

In connection with the Tobey homicide investigation, Taylor responded to the Sunset Hills Police Department on June 17, 2015, for the purpose of receiving his mobile phone (which he had voluntarily provided to law enforcement officials days earlier for forensic examination).  Taylor traveled to the police department in his Chevrolet Impala vehicle.  Taylor parked the vehicle in the police department parking lot.  Prior to Taylor's departure, a member of the Sunset Hills Police Department took photographs of Taylor's Impala while parked on the public lot (Exh. 6).

**2.     Discussion.**

Taylor had zero expectation of privacy in the exterior of his vehicle that was parked on a public parking lot.  "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir. 1994); *see also Stringer,* 739 F.3d at 396.  As the Eighth Circuit elucidated, "the person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." *United States v. McCaster,* 193 F.3d 930, 933 (8th Cir. 1999), citing *Minnesota v. Olson,* 495 U.S. 91, 96–97 (1990). "If a defendant fails to prove a sufficiently close connection to the

relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Gomez,* 16 F.3d at 256.

A commercial area open to the public is not an area in which even the property owner of the commercial area can claim a reasonable expectation of privacy.  *United States v. Dunn,* 480 U.S. 294, 316 (1987).  Courts have found that individuals have failed to demonstrate a reasonable expectation of privacy in a myriad of public locations, including: a shared business parking lot, the loading dock/parking area of business, motel parking lots used by motel guests, and common areas of apartment buildings. *See United States v. Reed,* 733 F.2d 492, 501 (8th Cir. 1984) (police officer's initial entry into business parking lot was not a search where lot was bordered by public streets on two sides and visible from public streets on two sides, plus the fenced gate was completely open to the public and shared by two separate businesses); *United States v. Edmonds,* 611 F.2d 1386, 1388 (5th Cir .1980) (no legitimate privacy expectation in loading dock/parking lot area of business premises); *United States v. Diaz,* 25 F.3d 392 (6th Cir. 1994) (motel guest did not have a reasonable expectation of privacy in the motel parking lot where his car was parked and canine drug sniff of exterior of guest's vehicle did not violate the Fourth Amendment); *United States v. Stockton,* 2005 WL 2173705 (E.D.Mich. 2005) (no reasonable expectation of privacy in shared commercial driveway even though the gate entrance to the driveway was sometimes locked); s*ee also United States v. McGrane,* 746 F.2d 632, 634 (8th Cir. 1984) (rejecting a generalized expectation of privacy in the common areas of an apartment building); *New York v. Class,* 475 U.S. 106, 118 (1986) (holding there is no reasonable expectation of privacy in a vehicle identification number, which is usually plainly visible from outside the car, either inside the door jamb or atop the dashboard).

Generally, less stringent warrant requirements have been applied to vehicles.  *Chambers v. Maroney*, 399 U.S. 42, 49 (1970).  A person has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects.  *Cardwell v. Lewis*, 417 U.S. 583, 589-91 (1974).  A car has little

capacity for escaping public scrutiny.  It travels public thoroughfares where its occupants and its contents are in plain view.  *See People v. Case*, 190 N.W. 289, 292 (1922).  "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."  *Cardwell*, 417 U.S. at 589-91 (quoting *Katz,* 389 U.S. at 351; *see also New York v. Class,* 475 U.S. 106, 114 (1986) ("The exterior of a car, of course, is thrust into the public eye, and thus to examine it does not constitute a 'search.' "); *United States v. Rascon-Ortiz,* 994 F.2d 749, 754 (10th Cir. 1993); *United States v. Hephner,* 260 F.Supp.2d. 763, 776 (N.D.Iowa 2003) (a toolbox located in an open truck bed "was not subject to Fourth Amendment protection").

For example, in *Cardwell*, the Court concluded that the warrantless examination of the exterior of an automobile parked in a public parking lot invaded no privacy right.  The examination revealed incriminating paint scrapings and tire treads on an operative wheel while the vehicle was parked in a public parking lot.   Nothing from the interior of the car and no personal effects -- which the Fourth Amendment traditionally has been deemed to protect -- were searched or seized and introduced in evidence.  With the "search" limited to the examination of the tire on the wheel and the taking of paint scrapings from the exterior of the vehicle left in the public parking lot, the Court "failed to comprehend what expectation of privacy was infringed."  417 U.S. at 591-92.  The Court held that the evidence derived from the warrantless examination of the car's exterior was "not the product of a 'search' that implicates traditional considerations of the owner's privacy interest."  *Id.* at 588-589, 94 S.Ct. at 2468; *see United States v. Frazier*, 538 F.2d 1322, 1326 (8th Cir. 1976).

A similar result was reached in *United States v. Evans*, No. 1:13CR00090 SNLJ, 2014 WL 4114411, at *5–6 (E.D. Mo. Aug. 18, 2014), *aff'd,* No. 15-1827, 2016 WL 4011174 (8th Cir. July 27, 2016).  In *Evans*, the defendant challenged a search of his vehicle's exterior when the vehicle was parked in a public car wash bay.  The Court rejected the argument in light of the fact

that Evans' vehicle was parked in a public space and, therefore, Evans had no reasonable expectation of privacy.  *Id.* at *6-7.

Here, Taylor's vehicle was in plain view for the public to see.  It was parked on the public parking lot outside the Sunset Hills Police Department.  Nothing from the interior of the car was searched or seized.  In light of the open and notorious use of the premises, there is no way Taylor could entertain a reasonable expectation of privacy in the parking lot where he voluntarily parked his vehicle.  *See Gomez,* 16 F.3d at 256.  Taylor's request to suppress photographs taken of the exterior of his vehicle while it was parked in a public space should be denied.

**F.    THE SEARCH OF TAYLOR'S 1513 OGDEN RESIDENCE (ITEM 6) WAS CONDUCTED PURSUANT TO A VALID WARRANT PROPERLY SUPPORTED BY PROBABLE CAUSE OR, ALTERNATIVELY, SEARCHED IN GOOD FAITH.**

**1.    Summary Background.**

In connection with the Davises homicide investigation, on July 24, 2015, United States Court Magistrate Judge Thomas C. Mummert issued a search and seizure warrant ordering members of law enforcement to search a residence associated with Taylor located at 1513 Ogden Avenue.  (A true and accurate copy of the federal "Ogden Warrant" is attached hereto as <u>Exhibit 15</u>.)  The warrant was executed the same day.  A search of the residence was conducted pursuant to the federal search warrant.  Multiple items were located and seized as noted on the warrant's return.

**2.    Discussion.**

a.    <u>Probable Cause Existed</u>.

The search warrant executed on July 24, 2015, was lawfully issued.  The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant.  When determining whether probable cause exists, a court does not independently evaluate each piece of information, but, rather, considers

all of the facts for their cumulative meaning. *United States v. Allen,* 297 F.3d 790, 794 (8th Cir. 2002).

As the Supreme Court stated in *Illinois v. Gates*, 462 U.S. 213 (1983), more fully:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for … conclud[ing]" that probable cause existed. *Jones v. United States,* 362 U.S., at 271, 80 S.Ct., at 736; *see also United States v. Baker*, No. 1:11CR 103 JAR, 2012 WL 12527307, at *11 (E.D. Mo. Sept. 29, 2012), *report and recommendation adopted sub nom. United States v. Turner*, No. 1:11CR103 JAR, 2013 WL 11271638 (E.D. Mo. Mar. 15, 2013), *aff'd,* 781 F.3d 374 (8th Cir. 2015).

The Court offered the following caution to reviewing courts, *Id.* at 236, 2331:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review.  A magistrate's "determination of probable cause should be paid great deference by reviewing courts." *Spinelli, supra,* 393 U.S., at 419, 89 S.Ct., at 590.

> "A grudging or negative attitude by reviewing courts toward warrants," *Ventresca,* 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner." *Id.,* at 109, 85 S.Ct., at 746.

For a warrant to issue properly under the Fourth Amendment, the warrant must be supported by probable cause.  *Gates*, 462 U.S. at 238-39; *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).  Probable cause exists, if under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238-39. In deciding whether there is probable cause to support a warrant, a judge may draw reasonable inferences from the totality of the circumstances.  *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007), cert denied, 128 S. Ct. 875 (2008).

Probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules. The Supreme Court found, 462 U.S. at 231, quoting from *Brinegar v. United States* (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

In analyzing the Ogden Warrant, it is important to understand the timing of when the Ogden Warrant was applied for and issued.  The Ogden Warrant was applied for and issued on July 24, 2015.  For months prior to that, an on-going federal grand jury investigation into Taylor's involvement in the murders of Erin and Juanita existed.  One or more confidential sources provided detailed information to law enforcement officials that Taylor admitted his being responsible for the two murders and that he used a firearm to commit the murders.  Those sources also stated that Taylor utilized the same firearm to commit each murder.  (Consistent with that information and  as  the  Ogden  Warrant  affidavit  noted,  shell  casings  from  a nine millimeter firearm were located at each murder scene and fired from the same firearm.)

Those same sources provided the same information *under oath* before the federal grand jury.  Based upon the information provided by those confidential sources and other witnesses, the federal grand jury returned an indictment against Taylor on July 16, 2015, finding sufficient probable cause to charge Taylor for his involvement in the murders of Erin and Juanita.  Stated another way, the federal grand jury found the sources' information sufficiently reliable to support a probable cause finding.

One of those same sources deemed credible by the federal grand jury provided additional information regarding another murder to which Taylor admitted — the July 14, 2015, murder of Todaro Taylor (no relation to Taylor).  Among other things, less than 24 hours after Todaro's murder occurred, the source reported that Todaro was shot to death by Taylor with the same

30

firearm Taylor used to kill Erin and Juanita and that Taylor had admitted this to the source.  As the Ogden Warrant affidavit notes, law enforcement officials were able to confirm that Todaro Taylor was shot once in the chest on July 14, 2015, and subsequently died.

On July 24, 2015, Taylor was arrested as he exited his Ogden residence pursuant to the federal arrest warrant issued some 10 days earlier.[6]  Subsequent to his arrest, the Ogden Warrant was applied for based upon the undisputed information gathered by law enforcement about the murders of Erin and Juanita, the confidential source information relied upon by the grand jury in finding probable cause to charge Taylor with a federal crime, and more recent information about the murder of Todaro Taylor provided by one of the same confidential sources already relied upon by the grand jury.

The purpose of the Ogden Warrant, among other things, was the recovery of the murder weapon.  At the time of the Ogden Warrant, the confidential sources' information was sufficiently reliable to support a probable cause finding because the person(s) providing the information had a track record of supplying reliable information and that information had been corroborated by independent evidence — such as the recovered ballistics evidence and the confirmation of Todaro Taylor's death by firearm. *See United States v. Morales,* 283 F.3d 952, 953 (8th Cir. 2001); *United States v. Williams,* 10 F.3d 590, 593 (8th Cir. 1993)).  Corroboration of minor, innocent details supports finding of probable cause. *United States v. Carpenter,* 341 F.3d 666, 669 (8th Cir. 2003).  And not every detail must be corroborated. *See United States v. Gladney,* 48 F.3d 309, 313 (8th Cir. 1995).  Moreover, here separate witnesses provided consistent information that established reliability to support a finding of probable cause. *See United States v. Fulgham,* 143 F.3d 399, 401 (8th Cir.1998) (stating that "the two informants' tips were

---

[6] When Taylor was asked to provide consent on July 24, 2015, to allow officers to search his home, Taylor demanded that the officers obtain a search warrant.  This is yet another example of Taylor's knowledge of the legal system's protections and his ability to provide or withhold consent as he deemed appropriate.

reciprocally corroborative, rendering their information enough to support a finding of probable cause").

As set forth above, this Court's role is simply to determine whether the issuing court had a substantial basis for making the "practical, common-sense decision" it did about whether there was a "fair probability" that officers would discover evidence of a crime. *See Gates,* 462 U.S. at 238; *Oropesa,* 316 F.3d at 766. Although each piece of information stated in the affidavit may not provide sufficient probable cause for the warrant to issue, taken together and given the totality of the circumstances, a reasonable person could believe there was a fair probability that evidence of a crime would be found in the information sought pursuant to this search warrant.

b.     Good faith.

If this Court should find no probable cause for the issuance of the warrant, the search and seizure was still valid pursuant to the "good faith exception" announced in *United States v. Leon,* 468 U.S. 897, 923 (1984).  *Leon* held that evidence obtained in violation of the Fourth Amendment by officers acting in objectively reasonable reliance on a search warrant issued by a neutral and detached magistrate need not be excluded as a matter of law.  *Id.* at 923. The Court held, "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." (*Id.* at 925).

Should this Court find probable cause lacking, the *Leon* exception should apply because there was a facially valid warrant that was reasonably relied upon.  Evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry,* 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell,* 485 F.3d 427, 430 (8th Cir. 2007)

32

(alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted).

Here, the good-faith exception applies.  There is no evidence to suggest that: (a) Judge Mummert abandoned his detached and neutral role; (b) the officers were dishonest or reckless in preparing the affidavit; (c) the officers' reliance on the warrant was not in good faith; or (d) the officers' reliance was not reasonable.  *See  United States v. Baker*, No. 1:11CR 103 JAR, 2012 WL 12527307, at *12–13 (E.D. Mo. Sept. 29, 2012), *report and recommendation adopted sub nom. United States v. Turner*, No. 1:11CR103 JAR, 2013 WL 11271638 (E.D. Mo. Mar. 15, 2013), *aff'd,* 781 F.3d 374 (8th Cir. 2015); *United States v. Lindsey*, No. CRIM. 10-15 JNE JJK, 2010 WL 4822939, at *33 (D. Minn. July 20, 2010), *report and recommendation adopted in part*, No. CRIM. 10-15 JNE JJK, 2010 WL 4822925 (D. Minn. Nov. 22, 2010), *aff'd in part,* 702 F.3d 1092 (8th Cir. 2013).  Just the opposite is true: the attesting agent affirmatively stated in his affidavit that he believed probable cause existed and United States Magistrate Jude Mummert agreed by signing and issuing the warrant.

\*   \*   \*

The search of 1513 Ogden residence was conducted pursuant to a valid search warrant supported by probable cause or, alternatively, the search was conducted consistent with the good faith exception to the warrant requirement.  In either case, the items located during the search were lawfully seized and are admissible.

**F.   TAYLOR HAD NO EXPECTATION OF PRIVACY IN THE TWO LETTERS HE MAILED WHILE DETAINED (ITEM 9).**

**1.   Summary Background.**

Following his federal indictment, Taylor was detained at the Sainte Genevieve County detention facility.  As a resident at the facility, Taylor was provided with and had access to the Inmate Handbook.  The handbook stated at Section 3.14.B:

> B.  *All inmate correspondence is considered property of this facility* until it is placed in a USPS receptacle & after it is delivered to the facility by the USPS.  As such, all incoming & outgoing mail is subject to being searched for contraband, except as may otherwise be noted.  Both incoming and outgoing mail may be read when reasonable suspicion exists that information pertinent to facility safety &/0r security concerns *or information about crimes is being communicated*... (emphasis added).

On August 15, 2015, Robinson had an in-person meeting with Taylor at the detention facility.  Among other things, Taylor informed Robinson that he would be sending to Robinson a letter about "old girl."  Robinson understood "old girl" to be a coded reference to Edger.

Against this backdrop, on August 20, 2105, the detention facility processed, reviewed and copied the Robinson Letter.  Among other things, the Robinson Letter directed Robinson to contact Edger for the purpose of Robinson to get Edger to lie and indicate that what Edger had previously told law enforcement about the murders was fabricated and coerced (Exh. 7).

Likewise, days later, the facility processed, reviewed and copied the Horton Letter. Among other things, the Horton Letter encouraged Horton to serve as an alibi witness for Taylor regarding Taylor's whereabouts on the date that Juanita was murdered (Exh. 8).

Both letters served as affirmative evidence to Counts 5, 6 and 7 of the superseding indictment which charges Taylor with witness tampering and document destruction.

**2.   Discussion.**

The review and seizure of certain pieces of Taylor's mail written by Taylor while he was in federal custody were proper because there is no legitimate expectation of privacy in prison mail.  Fourth Amendment protects against governmental invasions into a person's legitimate

34

expectation of privacy, which has two components: (i) the person must have an actual expectation of privacy, and (ii) the person's subjective expectation must be one that society deems to be reasonable. *Smith v. Maryland,* 442 U.S. 735, 740 (1979).  The Fourth Amendment protects prison inmates from unreasonable searches and seizures, but their reasonable expectation of privacy is far lower than that of most other individuals. *Levine v. Roebuck,* 550 F.3d 684, 687 (8th Cir. 2008); *see also Hudson v. Palmer,* 468 U.S. 517, 525–28 (1984) (holding that prisoners' fourth amendment rights retained while in prison are limited); *Bell v. Wolfish,* 441 U.S. 520, 558–60 (1979) (same); *Stroud v. United States,* 251 U.S. 15 (1919) (same); *Lyon v. Farrier,* 727 F.2d 766, 769 (8th Cir. 1984) (same).  Prisoners retain some Fourth Amendment rights, but those rights are necessarily reduced "because of the nature of incarceration and the myriad of institutional needs and objectives of prison facilities." *United States v. Peoples,* 250 F.3d 630, 637 (8th Cir. 2001); *Wolff v. McDonnell,* 418 U.S. 539, 555-56 (1974).  The threshold determination is whether a prisoner's expectation is "legitimate" or "reasonable."

A prisoner's Fourth Amendment rights "are not violated when his mail is inspected by jail officials." *United States v. Kelton,* 791 F .2d 101, 103 (8th Cir. 1986); s*ee also Ortiz v. Fort Dodge Correctional Facility,* 368 F.3d 1024, 1026 (8th Cir. 2004) (("While prisoners have a right to send and receive mail, prison officials have a legitimate interest in monitoring that mail for security reasons."); *Smith v. Boyd,* 945 F.2d 1041, 1043 (8th Cir. 1991) ("the inspection of nonprivileged mail does not violate a prisoner's constitutional rights").

The Supreme Court has held that, "while persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights ...," including loss of Fourth Amendment protection against random searches of individual prison cells.  *Hudson v. Palmer,* 468 U.S. 517, 524 (1984) (citing *Wolfish,* 441 U.S. at 545).  In the prison context, as in other contexts, "[t]he applicability of the Fourth Amendment turns on whether 'the person invoking its protection can

claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action.'" *Hudson v. Palmer,* 468 U.S. at 525 (quoting *Smith,* 442 U.S. at 740).  A prisoner's right to privacy in his or her prison cell should "always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that '[l]oss of freedom of choice and privacy are inherent incidents of confinement.' " *Palmer,* 468 U.S. at 528 (quoting *Wolfish,* 441 U.S. at 537).  The rationale set forth in *Hudson* applies equally to prison mail.  *Sueing v. Brown,* 817 F.2d 105 (6th Cir. 1987) (state prisoner claiming Fourth Amendment violation under 42 U.S.C. § 1983 has no reasonable expectation of privacy in nonprivileged mail); *Patrick v. Staples,* 780 F.Supp. 1528, 1539 (N.D.Ind. 1991) (same).

In *Stroud v. United States,* the Supreme Court held that interception by prison personnel and use in evidence by the prosecution of certain letters containing incriminating material written by a federal prisoner did not violate the Fourth Amendment rights of the accused.  251 U.S. at 21–22.  The Court reasoned that the letters were voluntarily written and that no threat or coercion was used to obtain them.  The Court further stated that the letters came into the possession of officials of the penitentiary under established practice, reasonably designed to promote the discipline of the institution.  *Id.* at 21–22.

Several circuit courts subsequent to *Stroud* have held that jail officials do not violate an inmate's Fourth Amendment rights by inspecting the inmate's mail. *See, e.g., United States v. Conley,* 531 F.3d 56, 58–60 (1st Cir. 2008) (defendant lacked a reasonable expectation of privacy in phone calls and mail sent from or received in prison); *United States v. Lucas,* 499 F.3d 769, 780 (8th Cir. 2007) (en banc) (same); *United States v. Morin,* 437 F .3d 777, 780 (8th Cir. 2006) (same); *United States v. Eggleston,* 165 F.3d 624, 626 (8th Cir. 1999) (same); *Stow v. Grimaldi,* 993 F.2d 1002, 1004-05 (1st Cir. 1993) (holding that a New Hampshire State Prison practice of requiring nonprivileged outgoing mail to be submitted for inspection in unsealed envelopes does not violate prisoners' constitutional rights); *Smith v. Delo,* 995 F.2d 827, 830

(8th Cir. 1993) (prison officials are justified in screening outgoing nonlegal mail for escape

plans, contraband, threats, or evidence of illegal activity); *United States v. Horr,* 963 F.2d 1124,

1126 (8th Cir. 1992); *United States v. Whalen,* 940 F.2d 1027, 1034-35 (7th Cir.), *cert. denied,*

502 U.S. 951 (1991) (holding that because prison officials are permitted to examine inmate mail

to ensure that the mail does not interfere with the orderly running of the prison, contain threats,

or facilitate criminal activity, there is no expectation of privacy in mail that inmates are required

to leave unsealed); *United States v. Kelton,* 791 F.2d 101, 103 (8th Cir. 1986) (prisoner's Fourth

Amendment rights were not violated when prison official inspected and copied prisoner's

outgoing mail); *Smith v. Shimp,* 562 F.2d 423, 426-27 (7th Cir. 1977) (reasoning that when a

pretrial detainee sends non-privileged mail, he knowingly exposes same to possible inspection

by jail officials and consequently yields to reasonable search and seizure); *United States v.

Baumgarten,* 517 F.2d 1020, 1028 (8th Cir.), *cert. denied,* 423 U.S. 878 (1975) (holding that,

under circumstances where prisoner knew of official policy of reading prisoners' outgoing and

unsealed mail, prisoner cannot say the state gained access to contents of a letter by unlawful

search and seizure); *see also United States v. Lindsey*, No. CRIM. 10-15 JNE JJK, 2010 WL

4822925, at *6 (D. Minn. Nov. 22, 2010), *aff'd in part,* 702 F.3d 1092 (8th Cir. 2013).

 In this case, the detention facility had a written policy which informed all prisoners that

their mail, both incoming and outgoing, may be inspected.  Taylor received a copy of the Inmate

Handbook which reflected this policy.  The detention facility regulations permitted prison

officials to open and read inmate correspondence where they have reason to believe that the

correspondence may contain information concerning criminal activities. As the Inmate

Handbook makes clear, "[a]ll inmate correspondence is considered property of this

facility."  The very existence of these regulations provide support for the conclusion that

although prisoners retain some Fourth Amendment rights while in prison, these rights are

limited by institutional security needs and the prisoner's own reduced expectation of privacy.

 Here, the record shows that Taylor's reputation and involvement with the murders of Erin

and Juanita, a request by law enforcement officials that the facility monitor Taylor's mail as part of the on-going homicide investigations, and his August 15 in-person visitation with Robinson in which Taylor referenced sending Robinson a letter about "old girl" provided the detention facility officials with "reason to believe" that Taylor's outgoing mail may contain "information about crime being committed." Thus, the facility complied with the regulations governing Taylor's mail.

Regardless of whether the regulation was or was not followed (Taylor argues it was not), the true question before this Court is whether Taylor had a legitimate expectation of privacy in his outgoing non-privileged mail. When a prisoner is made aware that his nonlegal mail may be subjected to official scrutiny, pursuant to institutional policies, the inmate's constitutional rights are not violated by the subsequent examination of such mail because he or she has no reasonable expectation of privacy in it. *See United States v. Mora*, 208 F.3d 228 (10th Cir. 2000) (citation omitted) ("[i]n order to enforce permissible restrictions which are reasonably related to substantial government interests, corrections officers must be able to inspect all outgoing mail.") *United States v. Solomon,* No. 02:05 CR 0385 01, 2007 WL 1099097, at *2–3 (W.D. Pa. Apr. 11, 2007); *Smith v. Delo,* 995 F.2d 827, 830 (8th Cir.1993) (Prison officials do not commit a constitutional violation by reading a prisoner's outgoing mail because prison officials have an interest in screening mail for contraband and threats to prison safety and security); *United States v. Lindsey*, No. CRIM. 10-15 JNE JJK, 2010 WL 4822939, at *42 (D. Minn. July 20, 2010), *report and recommendation adopted in part,* No. CRIM. 10-15 JNE JJK, 2010 WL 4822925 (D. Minn. Nov. 22, 2010), *aff'd in part,* 702 F.3d 1092 (8th Cir. 2013). The justification prison officials have to read non privileged mail in light of the legitimate objectives of the prison system, substantially diminishes, if not eliminates, the actual expectation of privacy Taylor might have had in the contents of envelopes submitted for non-privileged mailing. The fact that the facility expressly told Taylor that "[a]ll inmate correspondence [was] considered property of this facility" does eliminate any actual expectation pf privacy Taylor might have had.

38

Furthermore, due to the possibility that prison officials could inspect his non-privileged mail under established practice, reasonably designed to promote the discipline of the institution, Taylor also cannot establish an objectively reasonable expectation of privacy in this correspondence. *See Smith,* 562 F.2d at 427 ("What the pretrial detainee places in such envelopes he knowingly exposes to possible inspection by jail officials and consequently yields to reasonable search and seizure." (citing *Katz,* 389 U.S. at 351,)). Taylor cannot establish a legitimate expectation of privacy that has been invaded by unreasonable government action sufficient to establish a Fourth Amendment violation. Because prison officials acted pursuant to the facility regulations, and acted within the limits of the Fourth Amendment, suppression of the Robinson and Horton Letters is not warranted.[7]

Under this analysis, Taylor cannot demonstrate how his interest in the privacy of the nonprivileged correspondence seized by the facility officials outweighs the prison's interest in maintaining security. As the *Hudson* Court noted, "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." *Hudson v. Palmer, supra* at 527–28; *see also See United States v. Hardin*, No. 10-00131-01-CR-W-FJG, 2011 WL 4071173, at *9 (W.D. Mo. Aug. 18, 2011), *report and recommendation adopted*, No. 10-00131-01-CR-W-FJG, 2011 WL 3924876 (W.D. Mo. Sept. 7, 2011) (facility's copying and providing

---

[7] Regardless of the detention facility's procedures and Taylor's lack of privacy while detained, the Horton Letter is equally admissible because Horton provided the original copy of it to law enforcement officials.  While it is well settled that "[l]etters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy," *United States v. Jacobsen,* 466 U.S. 109, 114, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Fourth Amendment does not protect items that a defendant "knowingly exposes to the public." *United States v. Miller,* 425 U.S. 435, 442, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). Consequently, if a letter is sent to another, the sender's expectation of privacy ordinarily terminates upon delivery. *United States v. Gordon,* 168 F.3d 1222, 1228 (10th Cir.1999); *United States v. King,* 55 F.3d 1193 (6th Cir.1995).  In this case, Taylor sent the Horton Letter to Horton.  Taylor relinquished any expectation of privacy he may have otherwise had in the Horton Letter when it was delivered to Horton. *Id.* at 1196; *see also United States v. Dunning*, 312 F.3d 528, 531 (1st Cir. 2002).

of defendant's mail to United States was proper where facility previously notified defendant that mail would be subjected to monitoring).

*       *       *

Taylor has failed to establish a Fourth Amendment violation as a basis for suppression because he cannot claim a reasonable expectation of privacy in his nonprivileged correspondence written by him while detained.

**CONCLUSION**

For the foregoing reasons, and based upon additional information that may be provided during the evidentiary hearing on this motion, the United States of America respectfully requests that the Court deny in its entirety Taylor's motion to suppress evidence.

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

/s/ Thomas Rea
THOMAS REA, #53254MO
Assistant United States Attorneys
111 South Tenth Street, 20th Floor
Saint Louis, Missouri 63102
(314) 539-2200

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 21, 2016, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties and counsel of record.

/s/ Thomas Rea
THOMAS REA

40